1  **AKERMAN LLP**
   JOSHUA R. MANDELL (SBN 225269)
2  Email: joshua.mandell@akerman.com
   HALEY C. GREENBERG (SBN 307475)
3  Email: haley.greenberg@akerman.com
   601 West Fifth Street, Suite 300
4  Los Angeles, California 90071
   Telephone: (213) 688-9500
5  Facsimile:  (213) 627-6342

6  **LAW OFFICES OF JOHN MASON, LLC**
   JOHN E. MASON, JR. (SBN 51116)
7  Email: John@mason.legal
   40 Music Square West
8  Nashville, TN 37203
   Telephone: (615) 259-5325
9  Facsimile: (615) 259-5321

10 *Attorneys for Plaintiff Frankie Valli & The*
   *Four Seasons d/b/a Seasons Four*
11 *Music Corp. and Gavadima Music Inc.*

12            **UNITED STATES DISTRICT COURT**

13            **CENTRAL DISTRICT OF CALIFORNIA**

14

15 FRANKIE VALLI & THE
   FOUR SEASONS d/b/a SEASONS
   FOUR MUSIC CORP. and
16 GAVADIMA MUSIC INC.,                    Case No.

17            Plaintiff,                   **COMPLAINT**

18

19          - against -

20 EMI MUSIC PUBLISHING LIMITED; and
   DOES 1 through 50, inclusive,
21

22            Defendants.

23

24         Plaintiff Frankie Valli & The Four Seasons d/b/a Seasons Four Music Corp. and

25 Gavadima Music Inc. (collectively, "Plaintiff"), for its complaint against Defendant

26 EMI Music Publishing Limited ("Defendant"), by its attorneys, Akerman LLP, alleges

27 on knowledge as to its own acts and otherwise on information and belief, as follows:

28

*Sidebar (rotated):* **AKERMAN LLP** 601 WEST FIFTH STREET, SUITE 300 LOS ANGELES, CALIFORNIA 90071 TEL.: (213) 688-9500 – FAX: (213) 627-6342

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL: (213) 688-9500 – FAX: (213) 627-6342

## NATURE OF THE ACTION

1.    Plaintiff is engaged in the business of music publishing within the United States of America.  Plaintiff owns and/or controls, in whole or in part, the copyrights to certain musical compositions, including numerous works written, composed and/or performed by and/or for the famous American rock and pop band The Four Seasons a/k/a Frankie Valli and the Four Seasons (hereinafter "The Four Seasons").

2.    Defendant is engaged in the business of publishing and otherwise exploiting musical compositions.

3.    Plaintiff brings this action for (i) a declaration that the Agreement, dated January 1, 2000, by and between Plaintiff (through the d/b/a's Seasons Four Music Corp. and Gavadima Music Inc.) and Defendant (the "2000 Agreement"), as amended by the Agreement, dated May 12, 2009, by and between Plaintiff (through the d/b/a's Seasons Four Music Corp. and Gavadima Music Inc.) and Defendant (the "2009 Agreement," and with the 2000 Agreement, the "Agreements"), terminated as of December 31, 2016 or, at the very latest, September 30, 2017; (ii) a declaration that all rights granted to Defendant pursuant to the Agreements have reverted to and are the sole and exclusive property of Plaintiff; and (iii) an injunction preventing Defendant from exercising any of the rights granted to Defendant pursuant to the Agreements.[1]

## PARTIES

4.    Plaintiff Frankie Valli & The Four Seasons is a partnership organized under the laws of the State of California.  The partners in Plaintiff are Robert "Bob" Gaudio ("Gaudio") and Frankie Valli ("Valli").

5.    Gaudio is a songwriter, musician, performer and record producer, and was a founding member, performer, and primary songwriter of the world renowned musical group The Four Seasons, which has enjoyed one of the most successful

---

[1] Copies of the 2000 Agreement and 2009 Agreement are attached hereto as Exhibits 1 and 2, respectively.

**COMPLAINT**

43032631;8

careers of any musical act in history as evidenced by record sales exceeding 100 million copies, induction into the Rock and Roll Hall of Fame, and induction into the Vocal Group Hall of Fame.  Gaudio was also instrumental in the creation of and had many of his musical compositions featured in "Jersey Boys," based on the lives of The Four Seasons, which won four Tony Awards, including Best Musical, a Grammy Award for Best Musical Show Album, and was adapted into a hit feature film *Jersey Boys* produced and directed by Clint Eastwood.  Additionally, Gaudio is a member of the Songwriters Hall of Fame.

6.      Gaudio is an individual who is a citizen of the State of Tennessee.

7.      Valli was also a founding member of, and known as the frontman of, The Four Seasons.  Valli is a member of the Rock and Roll Hall of Fame.

8.      Valli is an individual who is a citizen of the State of California.

9.      Defendant is a private limited company organized under the laws of the United Kingdom, with its principal place of business at 30 Golden Square, London W1F 9LD, United Kingdom (the "Golden Address").  For purposes of determining diversity jurisdiction, a private limited company formed in the United Kingdom is treated as equivalent to a corporation, and a citizen of the United Kingdom. Defendant is dominated and controlled by, and its catalog is administered by, non-party Sony/ATV Music Publishing LLC, which is headquartered in New York, NY, doing business and with offices in Los Angeles, CA.

10.      Defendants DOES 1 to 50, inclusive, are sued under fictitious names. Their true names and capacities are unknown to Plaintiff.  When the DOE Defendants' true names and capacities are ascertained, Plaintiff will amend this Complaint by inserting their true names and capacities herein.   Each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged in this Complaint and knew, or had reason to know, that they were benefitting from the improper conduct of the named Defendant, or were otherwise responsible for the acts and omissions that caused Plaintiff to file this lawsuit.

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

43032631;8

11.     At all times mentioned in the Complaint, each of the Defendants was acting as the agent, actual or ostensible, and alter ego of each of the remaining Defendants, and in doing the things herein alleged, acted within the course and scope of such agency or other relationship, with the permission and consent of the Defendants, and as the alter egos of the other Defendants.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1332, 2201.  The matter in controversy with respect to Plaintiff's claims, exclusive of interest and costs, exceeds the sum of $75,000.  Specifically, the value of the rights granted pursuant to the Agreements, which are the object of this litigation, exceeds the sum of $75,000, exclusive of interest and costs.

13.     This Court has personal jurisdiction over Defendant because, *inter alia*, in negotiating and entering into the Agreements, Defendant purposefully directed its activities at the State of California and/or consummated a transaction with a resident (or residents) thereof. Defendant negotiated the Agreements with Plaintiff's designated agent, Peter C. Bennett ("Bennett"), who was and remains a citizen of the State of California.

14.     Additionally, the Agreements contain a choice-of-law provision stating that the "Agreement[s] shall be governed by and construed under the laws of the State of California, United States of America, applicable to contracts executed and wholly to be performed therein."

15.     Furthermore, Defendant made all payments pursuant to the Agreements to Plaintiff into the State of California.

16.     Venue is properly founded in this District pursuant to 28 U.S.C. §§ 1391(b) and 1391(c).  Defendant is subject to personal jurisdiction in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District.

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

CASE NO.

43032631;8

**THE 2000 AGREEMENT**

17.     Pursuant to the 2000 Agreement, Plaintiff transferred and assigned to Defendant the rights, throughout the world excluding the United States of America and Canada, with certain limitations, exceptions and conditions, (i) to print, publish and vend copies of the Compositions, (ii) to grant non-exclusive licenses for the manufacture of parts serving to reproduce the Compositions, (iii) of public performance for profit or otherwise, and of licensing such rights and of collecting royalties and fees payable by reason thereof, (iv) to grant non-exclusive licenses for the recording of the Compositions in and with motion pictures and television productions, (v) to use the Compositions in connection with audio-visual, sight and sound reproductions, and (vi) to grant non-exclusive licenses for the use of the Compositions for or in connection with the advertising or merchandising of products or services. Exhibit 1, ¶ 1.

18.     The rights granted to Defendant under the Agreements, including but not limited to those rights enumerated in Paragraph 17, are collectively referred to herein as the "Administration Rights."

19.     In the 2000 Agreement, "Compositions" is defined as the musical compositions owned and controlled by Plaintiff, which Compositions were set forth on Exhibit A to the 2000 Agreement. Exhibit 1, ¶ 1.

20.     The Compositions consist of numerous works written, composed and/or performed by and/or for The Four Seasons.

21.     Under the 2000 Agreement, Defendant had the duty to collect all sums payable to Defendant with respect to the exploitation of the Administration Rights, and was responsible for paying Plaintiff royalties in respect of the Compositions. Exhibit 1, ¶ 3.

22.     Under the 2000 Agreement, Defendant was also required to pay Plaintiff non-returnable advances recoupable from any and all royalties and/or other monies payable to Plaintiff. Exhibit 1, ¶ 20.

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

CASE NO.

43032631;8

23.     Under the 2000 Agreement, any notice required or desired to be given to Defendant must be written, and delivered either by hand or by mail to 127 Charing Cross Road, London WC2H OQY, England (the "Charing Cross Address"), or to such other address as Defendant may designate in writing. Exhibit 1, ¶ 9.

24.     The "Term" of the 2000 Agreement was from January 1, 2000 to December 31, 2009. Exhibit 1, ¶ 19.

25.     Under the 2000 Agreement, Plaintiff has the right at any time during the "Term" to send written notice to Defendant of its intention to terminate the "Term" of the 2000 Agreement. Exhibit 1, ¶ 11.

26.     Upon expiration or termination of the 2000 Agreement, all rights of any kind or nature granted to Defendant automatically revert to and become the sole and exclusive property of Plaintiff, without formality or execution of any documents.

## THE 2009 AGREEMENT

27.     Pursuant to the 2009 Agreement, Plaintiff and Defendant amended certain provisions of the 2000 Agreement. Exhibit 2.

28.     In the 2009 Agreement, Defendant designated its new address as 27 Wrights Lane, London W8 5SW, England (the "Wrights Address"). Exhibit 2, at 1.

29.     The 2009 Agreement extended the Term of the 2000 Agreement to December 31, 2011. Exhibit 2, ¶ 1.

30.     Pursuant to the 2009 Agreement, the 2000 Agreement would automatically extend on a three-month basis unless or until terminated by either party serving upon the other written notice any time prior to March 31, June 30, September 30 or December 31 in any year. Exhibit 2, ¶ 1.

## TERMINATION OF THE AGREEMENTS

31.     For 16 years, Plaintiff and Defendant operated pursuant to the Agreements.

32.     For example, Defendant paid Plaintiff the non-returnable advances required by the 2000 Agreement. Exhibit 1, ¶ 20.

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

43032631;8

33.     For 16 years, Defendant exercised its Administration Rights pursuant to the Agreements.

34.     For 16 years, Defendant received royalties, fees and/or other revenues based on its exercise of its Administration Rights pursuant to the Agreements.

35.     In 2016, Plaintiff decided to terminate the Agreements.

36.     Among other reasons, Plaintiff decided to terminate the Agreements because Defendant failed to properly account to Plaintiff, and failed to pay the royalties and other amounts due Plaintiff under the Agreements.

37.     On or about September 8, 2016, Plaintiff sent a notice of termination of the Agreements to Defendant at (i) the Charing Cross Address, (ii) the Wrights Address, and (iii) 550 Madison Avenue, New York, New York (Defendant's headquarters in New York).  A copy of this notice of termination is attached hereto as Exhibit 3.

38.     On or about September 15, 2016, Plaintiff sent another notice of termination of the Agreements to Defendant at (i) the Wrights Address, and (ii) the Golden Address.  A copy of this notice of termination is attached hereto as Exhibit 4.

39.     By September 2016, Defendant no longer maintained offices at the Charing Cross Address or the Wrights Address.  Defendant moved its offices to the Golden Address, but failed to designate its new address for purposes of the Agreements.

40.     Pursuant to these notices, the Agreements terminated as of December 31, 2016.

41.     In 2017, Defendant claimed that Plaintiff had failed to provide proper notice of termination of the Agreements.

42.     Therefore, on or about September 14, 2017, Plaintiff sent yet another notice of termination of the Agreements to Defendant at (i) the Charing Cross Address, (ii) the Wrights Address, and (iii) the Golden Address.  A copy of this notice of termination is attached hereto as Exhibit 5.

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

CASE No.

43032631;8

43.     Pursuant to this notice, the Agreements terminated, at the very latest, by September 30, 2017.

44.     Defendant claims that the Agreements are not terminated.

45.     Defendant is holding the Administration Rights hostage.

46.     Defendant is preventing Plaintiff from granting the Administration Rights to another entity.

## FIRST CAUSE OF ACTION

### (Declaratory Judgment - Against Defendant)

47.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 46 above as if fully set forth herein.

48.     There is an actual, present controversy regarding the legal rights and duties of the parties as they concern the Agreements.

49.     Specifically, there is an actual, present controversy regarding (i) whether the Agreements are terminated, and (ii) current ownership of the Administration Rights.

50.     Plaintiff is entitled to a declaration that the Agreements terminated as of December 31, 2016 or, at the very latest, September 30, 2017.

51.     Plaintiff is entitled to a declaration that all rights granted to Defendant pursuant to the Agreements have reverted to and are the sole and exclusive property of Plaintiff.

## SECOND CAUSE OF ACTION

### (Injunction – Against Defendant)

52.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 51 above as if fully set forth herein.

53.     Defendant should be enjoined from exercising any of the rights granted to Defendant pursuant to the Agreements.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

against Defendant, as follows:

    A. For a declaration that the Agreements terminated as of December 31, 2016 or, at the very latest, September 30, 2017;

    B. For a declaration that all rights granted to Defendant pursuant to the Agreements have reverted to and are the sole and exclusive property of Plaintiff;

    C. For a permanent injunction preventing Defendant from exercising any of the rights granted to Defendant pursuant to the Agreements;

    D. For attorneys' fees and costs; and

    E. For such other and further relief as this Court deems just and proper.

Dated:  October 25, 2017         **AKERMAN LLP**

                        */s/ Joshua R. Mandell*
                        Joshua R. Mandell
                        601 West Fifth Street, Suite 300
                        Los Angeles, California 90071
                        Tel. (213) 688-9500
                        Fax: (213) 627-6342
                        joshua.mandell@akerman.com

                        John E. Mason, Jr.
                        Law Offices of John Mason, LLC
                        40 Music Square West
                        Nashville, TN 37203
                        Tel. (615) 259-5325
                        Fax: (615) 259-5321
                        John@mason.legal

                        *Attorneys for Plaintiff Frankie Valli & The Four Seasons d/b/a Seasons Four Music Corp. and Gavadima Music Inc.*

AKERMAN LLP
601 WEST FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

CASE NO.

43032631;8

EXHIBIT 1

THIS AGREEMENT made the first day of January 2000 by and between SEASONS FOUR MUSIC CORP and GAVADIMA MUSIC INC. care of Peter Bennett Esq., 503 North Elm Drive, Beverly Hills, California 90210, USA (hereinafter collectively called "Owner") and EMI MUSIC PUBLISHING LIMITED of 127 Charing Cross Road, London WC2H OQY England (hereinafter called "Publisher") of the other part.

WHEREAS:-

(1)     Owner is engaged in the business of music publishing within the United States of America and owns or controls the copyrights of certain musical compositions; and

(2)     Publisher is engaged by itself and by its sub-publishers in the business of publishing and otherwise exploiting musical compositions throughout the world excluding the United States of America and Canada (herein the "Territory"); and

(3)     Publisher pursuant to the terms of an agreement between Saturday Music Inc and Genius Music ("the Parties") and Publisher dated first July 1981 as extended and varied including by letter agreements dated 15th March 1984, 6th June 1984, 17th July 1984, 1st July 1987, 1st July 1990, 20th January 1991, 26th July 1993, 22nd April 1994 and 26th March 1997 (together "the Original Agreement") became entitled to the rights in and to certain musical compositions co-owned by Owner and the Parties and administered worldwide by Saturday Music Inc under an agreement between Saturday Music Inc and Owner dated 28th December 1977 as extended and varied ("the Administration Agreement"); and

(4)     The Administration Agreement having terminated Publisher and Owner have agreed that the Original Agreement shall also be treated as terminated from the date hereof solely to the extent that the Original Agreement relates to Owner and specifically without reference to the Parties and that this Agreement shall replace the Original Agreement solely to the extent that the Original Agreement relates to Owner and specifically without reference to the Parties in connection with the musical compositions set forth on Exhibit "A" in this Agreement upon the terms and conditions and for the consideration hereinafter appearing.

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinbefore and hereinafter contained and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.     Owner hereby transfers and assigns to Publisher the following rights in and to each and every musical composition currently owned or controlled by Owner or any of its subsidiary companies, which compositions are set forth on Exhibit "A" annexed hereto, (hereinafter collectively referred to as the "Compositions"); provided, however, that Publisher shall acquire rights therein and thereto only to the extent that Owner owns or 

1                                                                                                                    76302

controls said rights but Publisher shall be deemed to have acquired such rights unless given written notice to the contrary by Owner:

(a)     The exclusive right to print, publish, vend and cause to be printed published and vended printed copies of the Compositions in the Territory in single sheet format or in songbooks, folios or similar editions. Notwithstanding the foregoing, Publisher acknowledges that Owner has heretofore granted to Columbia Pictures Publications the non-exclusive right to manufacture and print mixed folios embodying the Composition "The Sun Ain't Gonna Shine Anymore" together with compositions not owned or controlled by Owner. Furthermore, if Owner advises Publisher, by written notice, that it desires to import into the Territory printed music manufactured by Owner or its subsidiaries, affiliates or licensees in the United States, and if Publisher within twenty (20) days after receipt of such notice advises Owner, in writing, that it does not desire to print or publish said Compositions, then Owner reserves to itself the right to import such printed music into the Territory and Publisher shall have no right to receive any sums received by Owner on account of such importation;

(b)     The exclusive right to grant non-exclusive licenses for the manufacture of parts serving to reproduce the Compositions, including, but not limited to, the making of mechanical and electrical reproductions for piano rolls, phonograph records, tapes (cartridges or reel-to-reel), transcriptions, and for any other method as yet known or unknown, and to collect all royalties and fees payable therefor on sales within the Territory; provided, however, that such rights (i) shall not extend to audio-visual and sight and sound devices nor to phonograph records, magnetic tapes of all configurations and other similar devices manufactured in the Territory and initially exported, or initially sold for export, outside of the Territory, but (ii) shall extend to phonograph records, magnetic tapes of all configurations and other similar devices manufactured outside of the Territory (regardless of the country of manufacture) and initially imported, or initially sold for import, into the Territory;

(c)     Subject to any rights granted to performing rights societies, including without limitation BMI and ASCAP, the exclusive right of public performance for profit or otherwise (including broadcasting and television), and of licensing such rights and of collecting all royalties and fees payable by reason thereof in the Territory;

(d)     Upon securing the prior written consent of Owner (save in the case of uses pursuant to industry blanket agreements), the non-exclusive right to grant non-exclusive licenses for the recording of the Compositions in and with motion pictures and television productions produced in the Territory, and of making copies of the recordings thereof, and exporting such copies into all countries of the world. It is specifically understood and agreed that Publisher shall not share in any fees derived from the public performance outside of the Territory of any 

Composition contained in a motion picture or television production produced in the Territory, and that all such fees shall be payable to and collected by Owner or its designees;

(e)     Upon securing the prior written consent of Owner, the non-exclusive right to use and exercise the use of the Compositions, solely within the Territory, in connection with audio-visual, sight and sound reproductions and all similar and related uses (including video-discs and video-cassettes) now and hereafter known;

(f)     The right, exercisable only upon the written consent of Owner in each instance, (i) to authorise new adaptations and arrangements and any new or translated lyrics of the Compositions, and (ii) to print the lyrics thereof alone and separate from the music. Notwithstanding the generality of the foregoing Owner's consent shall not be required in respect of any adaptations or arrangements which may be made to musical compositions by a copyright user without seeking the approval of the copyright owners of such musical compositions pursuant to any law or general agreement between copyright users or any organisation representing such copyright users and a group of music publishers or organisation representing a group of music publishers. All such new matter including new adaptations and arrangements shall be obtained at the sole cost and expense of Publisher, but shall remain the sole property of and be copyrighted in the name of Owner, and subject to local collection society rules all royalties payable to any adaptor, and/or arranger, and/or lyricist shall be paid by Publisher out of its share of income from the Compositions and Owner shall receive the same income it would have received had no such adaptation, translation or arrangement been made;

(g)     Upon securing the prior written consent of Owner, the non-exclusive right, solely in the Territory, to grant non-exclusive licenses for the use of the Compositions for or in connection with the advertising or merchandising of products or services of any kind;

(h)     The right to collect on behalf of Owner any sums now payable in the Territory with respect to the exploitation of rights enumerated in Subparagraphs l(a)-(g) above occurring prior to the date hereof.

2.     Owner hereby reserves all rights of every kind and nature not specifically granted to Publisher herein, and the right to all fees, monies or other considerations derived from such reserved rights. Without limiting the generality of the foregoing, the following rights are reserved to Owner:

(a)     All rights in and to the worldwide copyrights in the Compositions and on any adaptations, arrangements, translations and new lyric versions throughout the world;

3

(b)     The exclusive right to dramatize, worldwide, the Compositions, and to license the use and performance of such dramatic versions throughout the world;

(c)     Subject to Paragraph 1(f) above, the exclusive right throughout the world to make cartoon, literary and other subsidiary versions of the Compositions and to publish and sell such cartoon, literary and other subsidiary versions;

(d)     The exclusive right to license worldwide uses of the titles of the Compositions separate and apart from the Compositions;

(e)     Subject to Paragraph 1(e) above, the sole and exclusive right throughout the world to use and license the use of the Compositions in connection with audio-visual, sight and sound reproductions and all similar and related audio-visual uses (including video-discs and video-cassettes) now or hereafter known. Notwithstanding the foregoing, Publisher shall have the right (subject to the Owner's rights as set forth in Paragraph 3 below) to collect and receive all royalties for the sale in the Territory of mechanical reproductions with respect to such audio-visual uses and contrivances;

(f)     Subject to Paragraph 1(g) above, the exclusive right throughout the world to grant licenses for any use, now known or hereafter known, of the Compositions for or in connection with the advertising or merchandising of products or services of any kind; and

(g)     Subject to Paragraph 1(d) above, the exclusive right throughout the world to grant licenses for the synchronization of the Compositions with motion pictures, together with the exclusive right to publicly perform for profit the Compositions contained in such motion pictures. Notwithstanding the foregoing, Publisher shall have the right (subject to Owner's rights as set forth in Paragraph 3 below) to collect and receive from the performing rights society in the Territory all performing fees earned by the Compositions during the Term hereof from public performances in the Territory of motion pictures with sound accompaniment, subject to Publisher's payment to Owner of the royalties herein specified.

3.     All sums payable to Publisher with respect to the exploitation of rights granted hereunder shall hereinafter be referred to as "Publishing Income". Publisher agrees that it shall have the duty to collect and to be responsible for the collection of all Publishing Income payable within the Territory. Publisher shall pay to Owner the following royalties in respect of the Compositions:

(a)     An amount equal to twelve and one-half percent (12-1/2%) of the suggested retail selling price in the country of sale of each printed edition of the Compositions (except editions containing Compositions and other musical compositions) sold by Publisher and paid for and not returned.

4

(b)     An amount equal to that proportion of twelve and one-half percent (12-1/2%) of the suggested retail selling price in the country of sale of each songbook, folio or similar edition containing Compositions and other musical compositions sold by Publisher and paid for and not returned which the number of Compositions included in such edition shall bear to the total number of musical compositions (including the Compositions) contained therein for which a royalty is payable.

(c)     An amount equal to eighty five percent (85%) of all gross monies paid by licensees of Publisher to Publisher as royalties for the sale in the Territory of mechanical reproductions of the Compositions; provided, however, that if Publisher procures a new recording of a Composition produced, recorded and initially released in the Territory (hereinafter called a "cover recording"), Publisher shall pay to Owner only sixty percent (60%) of all gross monies paid by licensees of Publisher to Publisher as royalties for the sale in the Territory of mechanical reproductions of such cover recording.

(d)     An amount equal to eighty five percent (85%) of the Publisher's share of all gross broadcasting and other performing fees with respect to the Compositions, it being understood and agreed that Publisher shall cause the performing and broadcasting rights of the Compositions to be registered with the performance rights societies in the Territory and shall authorize and direct the appropriate performance rights society to pay to it one hundred percent (100%) of said publisher's share.

(e)     An amount equal to eighty five percent (85%) of all gross monies paid by licensees of Publisher (including print licensees) for any other rights, including synchronization rights, assigned hereunder in and to the Compositions.

(f)     Provided Publisher performs each and all of its covenants, warranties and agreements hereunder, it shall be entitled to deduct and retain the remainder of Publishing Income.

(g)     Publisher shall pay over an amount equal to one hundred percent (100%) of all Publishing Income received by Publisher from any exploitation of rights in and to the Compositions other than those rights expressly set forth in Paragraph 1 hereof. Nothing herein contained shall in any way increase or enlarge the rights granted Publisher hereunder, which are solely as set forth in Paragraph 1 hereof.

(h)     Publisher agrees that it shall not license the mechanical reproduction of the Compositions for phonograph records at a rate less than the then current statutory rate in the Territory without the prior written consent of Owner or, if there is no statutory rate in the particular country of the Territory, at less than the customary rate, nor shall it refuse to grant a license for any Composition at the statutory or customary rate, as the case may be, in the Territory to any authorized manufacturer

5

76302

of phonograph records embodying a recording by Owner's record company affiliate, if any, or embodying a recording by any artist who is directly associated with Owner.

(i) Notwithstanding anything to the contrary contained herein, all royalties payable to Owner pursuant to this Paragraph are to be computed at the source from which the payments giving rise to such royalties are originally made less only the bona fide commissions and/or fees of any collecting society or organization and VAT or any similar tax and any other sales taxes required to be deducted.

(j) (i) In the event that Publisher shall receive during or after the Term of this Agreement, from any source whatever, including local mechanical rights or performing rights societies, record companies or any other person, firm or corporation, a payment or other distribution of funds (special or regular, including without limitation, increased royalty rates or bonus payments) based upon or related directly or indirectly to exploitation of the Compositions, including mechanical and performance income, with respect to any of the Compositions, Publisher shall pay Owner eighty five percent (85%) of such payments or other distribution of funds.

(ii) In the event that Publisher shall receive during or after the Term of this Agreement, from record companies, a payment or other distribution of funds (special or regular, including without limitation, increased royalty rates or bonus payments) based upon the amount of income derived from catalogues controlled or administered by Publisher, related directly or indirectly, to unidentified or general funds, Publisher shall pay Owner a fraction of eighty five percent (85%) of such payments or other distributions, the numerator of which shall be the income derived by Publisher from the sources of such payment or other distribution which shall be attributable to the Compositions and the denominator of which shall be the total income received by Publisher from the source of such payment or other distribution of funds, during the period of time covered by such payment or other distribution of funds.

(k) Notwithstanding anything to the contrary set out herein Publisher hereby confirms that none of the payments made or credited by either Publisher or Publisher's affiliate in Japan to Owner hereunder shall include any portion of the songwriter's royalties due to Sandy Linzer and/or Danny Rendell which are due and payable to them by Screen-Gems-EMI Music pursuant to separate agreements.

4. (a) Publisher shall forward to Owner two (2) copies of each edition of any Composition published by Publisher or its licensees and two (2) copies of each cover recording of a Composition obtained by Publisher, all within two (2) months after such publication and/or cover recording is secured.

(b)     Subject to local collecting society rules Publisher shall be responsible for and shall pay to the local adaptor(s), arranger(s) or lyricist(s) any royalties or fees for such services rendered, out of Publisher's individual share of royalties paid by licensees of Publisher, without any deduction from Owner's share of royalties payable hereunder.

(c)     Publisher agrees to produce at Publisher's cost a reasonable number of copies of a compact disc sampler containing recordings of various Compositions and circulate these copies to potential users of the Compositions in the Territory (including without limitation producers of television programmes and films) in order to encourage exploitation of the Compositions.

5.     In the event Publisher is prevented from paying royalties hereunder to Owner in the United States in United States dollars due to currency restrictions or any other reason outside the control of Publisher, Owner shall have the right to elect to accept payment in foreign currency in a depository selected by Owner, and Publisher shall deposit all payable sums to the credit of Owner in such foreign currency, and payment so received shall fulfill Publisher's obligations hereunder as to royalties payable to Owner.

6.     True and correct accounts shall be kept by Publisher in respect of royalties and fees received by it in respect of the Compositions, and a detailed statement of such accounts shall be delivered to Owner, on or before March 30th of each year for the semi-annual period expiring on the preceding December 31st, and on or before September 30th of each year for the semi-annual period expiring on the preceding June 30th at the address set forth below:

Seasons Four Music Corp/Gavadima Music Inc
c/o Peter Bennett, Esq.
503 North Elm Drive
Beverly Hills
California 90210
USA

At the same time as sending a hard copy of each royalty statement to Owner Publisher shall also send to Owner all the information contained in such statement on a 3½" floppy magnetic disc in ASC11 format which is suitable for use on an IBM compatible personal computer.  Each statement shall include, with respect to each of the Compositions, the following information: its title, the number of printed copies sold, the nature and amount of the Publishing Income received with respect thereto, the country in the Territory giving rise to the income, and Owner's share thereof.  Without limiting the generality of the foregoing, each statement shall reflect all accounting statements received by Publisher and Publisher's affiliated or subsidiary companies during the preceding semi-annual period, accompanied by payment to Owner of all Owner's share of Publishing

7

Income received by Publisher in England during the preceding semi-annual period. In countries where currency restrictions prevent the remittance of the whole or any part of royalties due, any royalties not remitted but which can be paid in said country shall, at the request of Owner, be held in an account to be nominated by Owner in the country concerned subject to the laws of such country. Except as hereinabove provided, all monies shown to be due thereunder shall be paid by Publisher in United States currency (except as hereinabove provided) to Owner, together with each such statement. Upon request from Owner, any such statement shall be accompanied by the relevant portions of the statements received by Publisher from the mechanical rights and performing rights societies, or any person, firm or corporation from which Publisher collects Publishing Income in the Territory. Timely accountings and payments shall be of the essence of this Agreement, and failure to make timely payments and deliver timely statements shall entitle Owner to give notice to Publisher to cancel this Agreement and cause an immediate reversion of all rights assigned hereunder in the event that such breach is not cured within thirty (30) days after the date of Owner's notice to Publisher.

Publisher shall permit an independent qualified accountant on behalf of Owner to inspect, upon the giving of not less than fourteen (14) days' written notice, at the place of business of Publisher and during usual business hours, all books, records and other documents relating to the Compositions, and to make copies or excerpts therefrom, for the purpose of verifying statements rendered by Publisher or statements which are delinquent under the terms hereof. All costs of Owner's audit of Publisher's books or records shall be borne by Owner, provided, however, that if it shall be determined that a shortage of ten percent (10%) or more has occurred, all costs of such audit shall be paid by Publisher. Such inspections shall not take place more often than once in any calendar year and not later than three (3) years after delivery of any particular statement.

7.   As a condition precedent to the grant of rights herein contained, all editions of the Compositions published in the Territory must bear appropriate copyright notice in Owner's name, and same must be printed at the bottom of the title page or first page of music of each such edition.

Such edition must be in accordance with applicable copyright laws, including the Berne Convention and the Universal Copyright Convention. Any editions of the Compositions published in the Territory which do not conform to the aforesaid requirements shall be deemed to have been published without the authority of Owner.

8.   Owner hereby appoints Publisher its attorney-in-fact to institute in its name any suit, action or proceeding in the Territory which Publisher shall deem necessary to enforce and protect Publisher's rights in the Compositions in the Territory, all at the expense of Publisher. In the event of any recovery, eighty five percent (85%) of the net proceeds resulting after deduction of expenses of litigation, including attorneys' fees and court costs, shall be paid by Publisher to Owner. If Publisher has not instituted any such suit, action or proceeding within thirty (30) days after Owner's request therefor, Owner shall 

have the right, exercisable any time thereafter, to institute such action, suit or proceeding in its own name, in which case one hundred percent (100%) of the recovery shall be retained by Owner.

9.   Any notice required or desired to be given to either party hereunder shall be written, and shall only be delivered by hand or sent by registered letter or recorded delivery letter if within the United Kingdom or by registered airmail letter if outside the United Kingdom (marked for the attention of the Director of Business Affairs in the case of notices addressed to Publisher) in which event such notice shall be deemed to have been received when delivered or two working days after posting thereof if within the United Kingdom and eight working days after posting thereof if outside the United Kingdom at the following addresses:

Publisher:

EMI MUSIC PUBLISHING LIMITED
127 Charing Cross Road
London WC2H OQY
England

Owner:

Seasons Four Music Corp/Gavadima Music Inc
c/o Peter Bennett, Esq.
503 North Elm Drive
Beverly Hills
California 90210
USA

or to such other address as either party may hereafter designate in writing to the other.

10.   If either party fails to perform any obligation required of it hereunder, or in the event either party shall go into compulsory liquidation, or shall go into bankruptcy, or make an assignment for the benefit of creditors, or make any composition with creditors, or if any insolvency or composition proceedings shall be commenced by or against either party and shall not be dismissed in forty-five (45) days (said party being hereinafter referred to as the "defaulting party"), then and in any of such events, the other party (hereinafter referred to as the "non-defaulting party"), in addition to such other rights or remedies which it may have at law or otherwise, under this Agreement, may elect to cancel or terminate this Agreement upon giving written notice to the defaulting party, as hereinafter provided, without prejudice to any rights or claims the non-defaulting party may have. The non-defaulting party's right to terminate as hereinabove provided shall be conditioned upon the giving of written notice to the defaulting party setting forth in detail the cause of said termination and indicating the non-defaulting party's intent to 

76302

so terminate. The defaulting party shall have thirty (30) days from the giving of said notice within which to cure said default before the notice of termination shall become effective.

11.  Owner shall have the right at any time during the Term to send written notice of its intention to terminate the Term of this Agreement to Publisher which notice shall contain a request to advise Owner, as soon as is practicable, of the then current unrecouped debit balance of Owner's royalty account plus an estimate of what such unrecouped debit is anticipated to be at the end of the calender quarter in which the notice is received by Publisher ("the Termination Date"). In the event that within 14 days of the Termination Date Publisher receives an amount equal to the estimated unrecouped debit balance as at the Termination Date (as previously advised to Owner by Publisher) then the Term of this Agreement shall be deemed to have expired on the Termination Date. For the avoidance of doubt, in the event that no such payment is received by Publisher then Owner's notice of intention to terminate shall be deemed to be of no effect and the Term of this Agreement shall continue in full force and effect but without prejudice to Owner's right to serve another notice of intention to terminate at a later date in respect of a future end of a calender quarter.

12.  No third party shall be deemed to be or is intended by the parties hereto to be a third-party beneficiary of this Agreement.

13.  Each party hereto warrants and represents to the other that it has the right to enter into this Agreement.

14.  If either party hereto institutes any action or proceeding under or in connection with this Agreement, the prevailing party in such action shall be entitled to reasonable attorneys' fees and court costs.

15.  The parties shall execute any further documents and do all acts necessary to fully effectuate the terms and provisions of this Agreement.

16.  Both Owner and Publisher agree to defend, indemnify and hold the other party harmless against any and all liability, loss, damage, cost or expense, including reasonable attorneys' fees, paid or incurred by reason of any breach or alleged breach by Publisher or Owner, as the case may be, of any covenants, warranties or representations hereunder.

17.  This Agreement shall inure to the benefit of and be binding upon the parties hereto, and all of their respective successors and assigns; provided that Publisher shall not, without the prior written consent of Owner, assign this Agreement to any person, firm or corporation other than to an affiliated company. No assignment shall relieve the assignor from its obligations hereunder. Nothing contained herein shall prevent Publisher from sub-publishing the Compositions within the Territory in the normal course of business; provided, however, that any assignment by Publisher to a third party sub-publisher not 

10                                                                                          76302

an EMI affiliate shall require the prior approval of Owner, not to be unreasonably withheld, and provided further that any fees of all such sub-publishers shall be borne solely by Publisher. Owner hereby confirms that it approves of Publisher's sub-publishers who are not EMI affiliates who will be sub-publishing the Compositions at the commencement of the Term.

18.  In the event that Owner decides to sell, transfer, assign, or otherwise dispose of any interest in the copyright of the Compositions or any of them Owner shall not conclude any such sale, transfer, assignment or disposal without first offering to Publisher the right to buy or acquire such interest in the copyright of the Compositions or any of them (as the case may be) at the same bona fide price and pursuant to the same bona fide terms as may be offered to Owner by any responsible, prospective and unrelated third party which terms Owner wishes to accept. Owner agrees to give Publisher by registered post notice of such bona fide and acceptable offer as described above (which notice shall set forth the name of the prospective purchaser, the price and all other terms contained in such offer) and Publisher shall have fifteen (15) business days after actual receipt of such notice to advise Owner as to whether or not it desires to acquire any interest in said copyright of the Compositions or any of them (as applicable) at the price and pursuant to the terms set forth in said notice. In the event the Purchaser fails to give Owner notice within the said fifteen (15) business day period that it is exercising its option to buy or acquire the interest in the said copyrights, then Owner shall have the right to accept the bona fide offer made by the prospective purchaser, but only as set forth in its notice as aforesaid; provided, however, if it does not accept the bona fide offer from a prospective purchaser within ninety (90) days after expiration of the said fifteen (15) business day period, then the procedure set forth in this paragraph shall once again be followed by Owner before it may dispose of any interest in the copyright of the Compositions or any of them. In the event that the Owner receives an offer from a third party to purchase Owner's interest in both the recordings it owns of the Compositions and the Compositions themselves then for Publisher to match such offer it must make an offer to include both the said recordings and the Compositions. For the avoidance of doubt this clause shall not apply in the case of Owner entering into an agreement with a third party for such third party to sub-publish or administer the Compositions in the United States of America and Canada.

19.  The Term of this Agreement shall commence as of the date hereof and shall continue for a period of ten (10) years. At the expiration or termination of this Agreement, all rights of any kind or nature granted to Publisher hereunder shall automatically revert to and be the sole and exclusive property of Owner without formality or execution of any documents, and Publisher shall not be entitled to any share of royalties or other monies paid thereafter; provided, however, Publisher shall continue to have the right to collect income hereunder on the terms and conditions hereof in respect of any accounting period utilized by a performance or mechanical rights society or other record company or entity making payments to Publisher if such accounting period terminates on or before the date upon which this Agreement expires or is terminated. For example, in the United Kingdom Publisher would be entitled to receive the PRS quarterly accounting reflecting 

11                                                                                                     76302

the July 2009 to December 2009 broadcasting fees which Publisher receives from PRS on or about April 2010, and in France, Publisher would be entitled to receive the SACEM statement for performances during the second half of 2009 received by Publisher in April or July 2010. Whenever the society statements rendered cover an annual period as opposed to a semi-annual period, Publisher agrees to prorate such statement and pay over to Owner, or its new sub-publisher in the Territory, those earnings reflected in the semi-annual period subsequent to the expiration date of this Agreement. Notwithstanding the foregoing, if as of December 31, 2009, Publisher shall have obtained two (2) cover recordings of any Composition in the Territory during the Term hereof, Publisher shall continue to have the right to exploit said Composition and collect Publishing Income with respect to such Composition only, solely in the particular country in the Territory in which such cover recording was secured, subject to all of the terms and conditions hereof, for an additional period of two (2) years from and after the expiration date of this Agreement. Notwithstanding anything to the contrary contained in this Agreement, in the event that, as of the statement rendered for the period ending December 31, 2009, Publisher has not recouped in full all sums advanced by Publisher theretofore under this Agreement (having taken into account Publisher's bona fide estimate of pipeline income), the Term of this Agreement shall automatically continue until the end of the accounting period in which Publisher does recoup in full all sums advanced to Owner as aforesaid theretofore subject to a maximum extension period of twelve (12) months. For the purposes of this paragraph "pipeline income" shall mean the percentage of royalties and fees payable to Owner under this Agreement which have actually been received by Publisher in the United Kingdom but not yet credited to Owner's royalty account or received by Publisher's sub-publishers but not yet paid to Publisher.

20. Publisher shall pay to Owner, as non-returnable advances recoupable from any and all royalties and/or other monies payable to Owner pursuant to Paragraph 3 hereunder the following sums at the following times:-

   (a) US$500,000 (five hundred thousand United States dollars) within fourteen days of the receipt by Publisher of a copy of this Agreement signed by Owner;

   (b) US$500,000 (five hundred thousand United States dollars) after 5th January but no later than 10th January 2001;

   (c) US$500,000 (five hundred thousand United States dollars) after 5th January but no later than 10th January 2002;

   (d) US$500,000 (five hundred thousand United States dollars) after 5th January but no later than 10th January 2003;

   (e) US$500,000 (five hundred thousand United States dollars) after 5th January but no later than 10th January 2004;

76302

(f)     US$500,000 (five hundred thousand United States dollars) after 5th January but no later than 10th January 2005;

(g)     US$500,000 (five hundred thousand United States dollars) after 5th January but no later than 10th January 2006;

(h)     US$500,000 (five hundred thousand United States dollars) after 5th January but no later than 10th January 2007;

(i)     US$500,000 (five hundred thousand United States dollars) after 5th January but no later than 10th January 2008;

(j)     US$500,000 (five hundred thousand United States dollars) after 5th January but no later than 10th January 2009.

21.     Notwithstanding anything to the contrary contained in this Agreement the advances payable under subparagraphs 20 (a) to (j) above shall not be recoupable from any royalties reflected on the accounting statements to be rendered to Owner by Publisher for the accounting period ending 31st December 1999 under the Original Agreement.

22.     Owner hereby represents and warrants that:

(a)     Owner owns or controls the rights granted to Publisher hereunder or the copyright in the Compositions free and clear of all claims and encumbrances and that Owner is free to enter into this Agreement.

(b)     During the Term of this Agreement Owner will not grant any rights in the Compositions or any of them to any other person, firm or company other than Publisher or enter into any Agreement or act in any way which would derogate from the rights granted to Publisher hereunder.

(c)     Owner shall be entirely responsible for paying royalties and sums due to the writers and composers of the Compositions.

(d)     This Agreement shall be regarded as a certificate for the purposes of Rule 1(o) of the rules of the Performing Right Society Ltd. authorizing the Society to treat Publisher as exploiting the Compositions.

(e)     The Compositions are original, or adaptations of public domain works, and that none of the Compositions infringes any other copyright work or the rights of any third party.

23.     This Agreement constitutes the entire agreement between the parties with regard to the subject matter hereof, and cannot be altered, amended or modified, in part or in full, in 

13                                                                                          76302

any way except by an instrument in writing signed by the party sought to be bound, unless otherwise expressly provided herein.

24.    This Agreement shall be governed by and construed under the laws of the State of California, United States of America, applicable to contracts executed and wholly to be performed therein.

25.    It is expressly agreed that Publisher shall not be entitled to deduct or withhold income or other similar tax from sums payable to Owner hereunder pursuant to the laws of the Territory unless Publisher shall furnish to Owner, with each statement, a certificate in the form of a certificate setting forth the amount of tax which shall have been withheld, the rate of tax, and any other necessary information which shall enable Owner, upon presentation of such certificate, to obtain income tax credit from the United States Internal Revenue Service for the tax so withheld.

26.    As used in this Agreement, unless the context calls for a contrary interpretation, the masculine gender shall include the feminine, and the term "person" shall include any person, firm or corporation.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed the day and year first above written.

By _____
for and on behalf of
SEASONS FOUR MUSIC CORP

By _____
for and on behalf of
GAVADIMA MUSIC INC.

14                                                                                                    76302

By _____

and by _____

for and on behalf of
EMI MUSIC PUBLISHING LIMITED

## EXHIBIT A

| Title | Writer(s) | Writer's Share | Co-Publisher | % Control | © Year |
|-------|-----------|----------------|--------------|-----------|--------|
| Alleen Van Jou Zijn | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| Als In 'n Droom | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| American Crucifixion and Resurrection | Gaudio/ Holmes | 50% | EMI Full Keel Music | 50% | |
| Around and Around | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |

15

76302

| Title | Writer(s) | Writer's Share | Co-Publisher | % Control | © Year |
|-------|-----------|----------------|--------------|-----------|--------|
| Can't Take My Eyes Off You | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| The Carol Of The Bells | Calello | 50% | EMI Longitude Music | 50% | |
| Check The Yellow Pages | Cifelli/ Petriollo | 25% | EMI Longitude Music | 25% | |
| C'Mon Marianne | Brown/ Bloodworth | 25% | EMI Longitude Music | 25% | |
| Comin' Up In The World | Crewe/ Santos | 25% | EMI Longitude Music | 25% | |
| Cry For Me | Gaudio | 75% | EMI Longitude Music | 75% | |
| Danger | Gaudio/ Linzer | 50% | EMI Longitude Music | 50% | |
| Dawn (Go Away) | Gaudio/ Linzer | 50% | EMI Longitude Music | 50% | |
| Deheb Jiswa Ftit Ta Skiet | Gaudio/ Crewe/ Agius | 50% | EMI Longitude Music | 50% | |
| Dody | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| Everybody Knows My Name | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| The Excelsis Deo Medley | Bass | 50% | EMI Full Keel Music | 50% | |

17

76302

| **Title** | **Writer(s)** | **Writer's Share** | **Co-Publisher** | **% Control** | **© Year** |
|---|---|---|---|---|---|
| Baby Toys | Layton/ Linzer/ Randell/ Decillis | 50% | My Songs Inc | 50% | |
| Back On The Road Again | | 50% | EMI Longitude Music | 50% | |
| B-Boy Hump | Gaudio/ Crewe/ Silvester/ Peake | 45% | EMI Longitude Music | 45% | |
| Beggin' | Gaudio/ Farina | 50% | EMI Longitude Music | 50% | |
| Beggars Parade | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| The Best Of Me | | 50% | EMI Longitude Music | 50% | |
| Betrayed | Linzer/ Randell | 100% | | 100% | |
| Big Man's World | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| Big Man In Town | Gaudio | 75% | EMI Longitude Music | 75% | |
| Born To Wander | Peterson | 25% | EMI Full Keel Music | 25% | |
| Bye Bye Baby (Baby Goodbye) | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |

76302

| **Title** | **Writer(s)** | **Writer's Share** | **Co-Publisher** | **% Control** | **© Year** |
|---|---|---|---|---|---|
| Expression Of Love | Petrillo Cifelli | 25% | EMI Longitude Music | 25% | |
| Face Without A Name | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| The First Christmas Night Medley | Bass | 50% | EMI Full Keel Music | 50% | |
| Fox In A Bush | Petrillo/ Cifelli | 25% | EMI Longitude Music | 25% | |
| Funny Face | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| Ganz Ohne Liebe | Gaudio/ Crewe/ Schulz | 50% | EMI Longitude Music | 50% | |
| Gefuehle Gehen Manchmal Vorbei | Gaudio/ Crewe/ Jud/ Kaiser | 50% | EMI Longitude Music | 50% | |
| Girl Come Running | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| The Girl I'll Never Know (Angels) | Brown/ Bloodworth | 25% | EMI Longitude Music | 25% | |
| Golden Ribbon | Gaudio | 75% | EMI Longitude Music | 75% | |
| Goodbye Girl | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |

76302

| Title | Writer(s) | Writer's Share | Co-Publisher | % Control | © Year |
|-------|-----------|----------------|--------------|-----------|--------|
| Huggin' My Pillow | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| The Hullaballoon | Petrillo/ Cifelli | 25% | EMI Longitude Music | 25% | |
| Idaho | Gaudio/ Holmes | 50% | EMI Full Keel Music | 50% | |
| Ilk Askim Sensin | Gaudio/ Crewe/ Talu | 50% | EMI Longitude Music | 50% | |
| I'll Keep Pretending (That You Love Me) | Petrillo/ Randell | 25% | EMI Longitude Music | 25% | |
| I Make A Fool Of Myself | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| I'm A Good Guy Babe | Petrillo/ Randell | 25% | EMI Longitude Music | 25% | |
| I'm Gonna Change | Petrillo/ Cifelli | 25% | EMI Longitude Music | 25% | |
| I Remember Rhoda | Linzer/ Randell | 100% | | 100% | |
| It's A Lonely World | | 50% | EMI Longitude Music | 50% | |
| I Woke Up (With Your Name On My Lips) | Crewe | 25% | EMI Longitude Music | 25% | |

76302

| Title | Writer(s) | Writer's Share | Co-Publisher | % Control | © Year |
|---|---|---|---|---|---|
| Joy To The World | Bass | 50% | EMI Full Keel Music | 50% | |
| Joy To The World Medley | Bass | 50% | EMI Full Keel Music | 50% | |
| Lay Me Down (Wake Me Up) | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| Le Chemin de L'Amour | Linzer/ Randell | 25% | | 25% | |
| Let's Hang On | Crewe/ Linzer/ Randell | 100% | | 100% | |
| Let's Ride Again | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| Little Boy (In Grown-Up Clothes) | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| Little Angel | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| Living Just For You | Massi | 25% | EMI Longitude Music | 25% | |
| Look Up Look Over | Gaudio/ Holmes | 50% | EMI Full Keel Music | 50% | |
| Lucky Day | Pesci/ Roberto | 25% | EMI Longitude Music | 25% | |
| Mad About You Baby | Pesci/ Randell | 25% | EMI Longitude Music | 25% | |

76302

| **Title** | **Writer(s)** | **Writer's Share** | **Co-Publisher** | **% Control** | **© Year** |
|---|---|---|---|---|---|
| Marcie | Gaudio/ Linzer | 50% | EMI Longitude Music | 50% | |
| The Merry Christmas Medley | Bass | 50% | EMI Full Keel Music | 50% | |
| Millie | Gaudio | 75% | EMI Longitude Music | 75% | |
| Mrs Stately's Garden | Gaudio/ Holmes | 50% | EMI Full Keel Music | 50% | |
| Night Hawk | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| No Surfin' Today | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| One Clown Cried | Linzer/ Randell | 100% | | 100% | |
| Only Yesterday | Rambeau/ Rehak | 25% | EMI Longitude Music | 50% | |
| Opus 17 (Don't You Worry 'Bout Me) | Linzer/ Randell | 100% | | 100% | |
| Paintin' The Town | Gaudio | 75% | EMI Longitude Music | 75% | |
| Pity | Crewe/ Petrillo | 25% | EMI Longitude Music | 25% | |
| Proud One | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |

76302

| Title | Writer(s) | Writer's Share | Co-Publisher | % Control | © Year |
|-------|-----------|----------------|--------------|-----------|--------|
| The Puppet Song | Schroeck/ Loring | 25% | EMI Longitude Music | 25% | |
| Rag Doll | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| Raven | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| Ronnie | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| Sassy | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| Saturday's Father | Gaudio/ Holmes | 50% | EMI Full Keel Music | 50% | |
| Save It For Me | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| Show Girl | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| Silence Is Golden | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| The Singles Game | Brown/ Bloodworth | 25% | EMI Longitude Music | 25% | |
| Somebody's On Her Mind | Gaudio/ Holmes | 100% | EMI Full Keel Music | 100% | |
| Something's On Her Mind | Gaudio/ Holmes | 50% | EMI Full Keel Music | 50% | |
| Soul Of A Woman | Gaudio/ Holmes | 50% | EMI Full Keel Music | 50% | |

76302

| **Title** | **Writer(s)** | **Writer's Share** | **Co-Publisher** | **% Control** | **© Year** |
|---|---|---|---|---|---|
| The Sun Ain't Gonna Shine Anymore | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| Sundown | Petrillo/ Bernstein | 25% | EMI Longitude Music | 25% | |
| Tell It To The Rain | Petrillo/ Cifelli | 25% | EMI Longitude Music | 25% | |
| This Is Goodbye | Gaudio | 75% | EMI Longitude Music | 75% | |
| To Give (The Reason I Live) | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| To Make My Father Proud (To Make ... | Crewe/ Weiss | 100% | EMI Longitude Music | 100% | |
| Too Many Memories | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| Toy Soldier | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| The Trouble With Me | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| Wall Street Village Day | Gaudio/ Holmes | 50% | EMI Full Keel Music | 50% | |
| Watch The Flowers Grow | Brown/ Bloodworth | 25% | EMI Longitude Music | 25% | |

76302

| **Title** | **Writer(s)** | **Writer's Share** | **Co-Publisher** | **% Control** | **© Year** |
|---|---|---|---|---|---|
| Watch Where You Walk | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| We'll Be Making Out | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| What About Me | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |
| What Child Is This | Bass | 50% | EMI Full Keel Music | 50% | |
| When I Was A Kid | Petrillo/ Cifelli | 25% | EMI Longitude Music | 25% | |
| Where The Streets Have No Name (I.... | Gaudio/ Crewe/ Hewson/ Evans | 25% | EMI Longitude Music/ U2 Music | 25% | |
| Who's That | Gaudio/ Crewe | 100% | | 100% | |
| Wonder What She Will Be | Gaudio/ Holmes | 50% | EMI Full Keel Music | 50% | |
| Workin' My Way Back To You | Linzer/ Randell | 100% | | 100% | |
| You Don't Know | Crewe | 25% | EMI Longitude Music | 25% | |
| You're Gonna Hurt Yourself | Crewe/ Calello | 25% | EMI Longitude Music | 25% | |
| You're Ready Now | Gaudio/ Crewe | 50% | EMI Longitude Music | 50% | |

76302

# EXHIBIT 2

THIS AGREEMENT is made the  *12th*  day of  *May*  2009
BETWEEN **SEASONS FOUR MUSIC CORP** and **GAVADIMA MUSIC INC.** both care
of Peter Bennett Esq., 503 North Elm Drive, Beverly Hills, California 90210, USA ("Owner")
of the one part and **EMI MUSIC PUBLISHING LIMITED** of 27 Wrights Lane, London
W8 5SW, England ("Publisher") of the other part and is supplemental to the agreement
entered into between Owner and Publisher dated 1st January 2000 ("the Agreement").

WHEREAS the parties hereto desire to amend the Agreement in the manner set out below.

In consideration of the payment by Publisher to Owner of the sum of £1 (one pound) (the
receipt of which is hereby acknowledged) it is hereby agreed as follows:-

1.    Notwithstanding anything to the contrary contained in the Agreement the Term of the
      Agreement shall continue until 31st December 2011 and thereafter shall automatically
      extend on a 3 (three) monthly basis unless or until terminated by either party serving
      upon the other written notice any time prior to such 31st March, 30th June, 30th
      September or 31st December in any year. For the avoidance of doubt, the increased
      rates specified in paragraph 2 below shall continue to apply during any such extension.

2.    With respect to royalties and fees earned by the Compositions and received by
      Publisher:

      (a)    between 1st January 2007 and 31st December 2008 the expressions "eighty
             five percent (85%)" and "sixty per cent (60%)" where set out in sub-clauses
             3(c), (d) and (e) of the Agreement shall be treated as reading "ninety percent
             (90%)" and Publisher shall in the next statement apply a retrospective
             adjustment in Owner's favour in order to reflect the difference between the
             eighty five percent (85%) and sixty percent (60%) rates applied prior to the
             date hereof and the new ninety percent (90%) rate, and

      (b)    after 31st December 2008 the expressions "eighty five percent (85%)" and
             "sixty percent (60%)" where set out in sub-clauses 3(c), (d) and (e) of the
             Agreement shall be treated as reading "ninety two point five percent (92.5%)"

3.    For the avoidance of doubt:

      (a)    no advances are or shall be due to Owner, and

      (b)    specifically, and without limitation or qualification, the Agreement shall
             continue to exclude any and all royalties or other fees of any and every nature
             payable to Owner, directly or indirectly, with respect to the inclusion of the
             Compositions in any production of the stage play known as "Jersey Boys" or
             the exploitation of any ancillary or supplemental rights related thereto save that
             it is recognised that in certain circumstances Publisher may receive income
             through the collection society system from the exploitation of the
             Compositions in the context of the stage play known as "Jersey Boys" where
             the relevant activity is subject to exclusive society mandates. By way of
             example, where an audio visual recording of the play is broadcast on 

1

television, broadcast income may be received by Publisher through the local performing rights society. Publisher shall not be in breach of the Agreement by virtue of the receipt of such sums and shall account to Owner in respect of ninety two point five per cent (92.5%) of such sums in accordance with the Agreement.

4. The terms and expressions used herein shall have the same meanings as are given to them in the Agreement.

5. It is acknowledged and agreed that nothing in this Agreement provides expressly for any third party to have any right to enforce any of its terms or the terms of any agreement between the parties which it modifies and for the complete avoidance of doubt, the parties do not intend any term of this Agreement or any agreement between the parties which it modifies to be enforced by or to confer any benefit upon any third party.

6. All other terms and conditions of the Agreement shall remain unaltered.

AS WITNESS the hands of the parties the day and year first before written.

SIGNED by
for and on behalf of
**SEASONS FOUR MUSIC CORP**

in the presence of

SIGNED by
for and on behalf of
**GAVADIMA MUSIC INC.**

in the presence of

2

SIGNED by                       )
                                      )
                                      )
                                      )
                                      )
AND by                         )
for and on behalf of         )
**EMI MUSIC PUBLISHING LIMITED**  )

3

# EXHIBIT 3

# ROBERT GAUDIO
## SEASONS FOUR MUSIC CORP / GAVADIMA MUSIC INC.
### c/o Law Offices of John Mason
### 40 Music Square West
### Nashville, TN 37203

September 8, 2016

***VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED***

EMI Music Publishing Limited
ATTN: Director of Business Affairs
127 Charing Cross Road
London, WC2H OQY
ENGLAND

EMI Music Publishing Limited
ATTN: Director of Business Affairs
27 Wrights Lane
London, W8 5SW
ENGLAND

> **Re:**  ***Seasons Four Music Corp and Gavadima Music Inc. -w-***
> ***EMI Music Publishing Limited***

Dear EMI Music Publishing Ltd.

Reference is hereby made to that certain publishing agreement made January 1, 2000 by and between Seasons Four Music Corp and Gavadima Music Inc. on the one hand ("Owners") and EMI Music Publishing Ltd ("Publisher") as amended May 12, 2009.  Pursuant to Paragraph 1 of the Amendment of May 12, 2009, Owner hereby notifies Publisher of its intention to terminate the Agreement and the administration rights of Publisher effective December 31, 2016.

Very truly yours,

ROBERT GAUDIO for                    ROBERT GAUDIO for
SEASONS FOUR MUSIC CORP.             GAVADIMA MUSIC, INC.

By: _____          By: _____

cc:  Frankie Valli
     Barry Siegel
     Zach Best
     Bruce Scavuzzo, EMI Music, Inc.

# EXHIBIT 4

# ROBERT GAUDIO
## SEASONS FOUR MUSIC CORP / GAVADIMA MUSIC INC.
### c/o Law Offices of John Mason
### 40 Music Square West
### Nashville, TN 37203

September 8, 2016

EMI Music Publishing Limited
ATTN: Director of Business Affairs
27 Wrights Lane
London, W8 5SW
ENGLAND

EMI Music Publishing Limited
c/o Sony/ATV Music Publishing
30 Golden Square
London W1F 9LD
ENGLAND

Re:  *Seasons Four Music Corp and Gavadima Music Inc. -w-*
     *EMI Music Publishing Limited*

Dear EMI Music Publishing Ltd.

Reference is hereby made to that certain publishing agreement made January 1, 2000 by and between Seasons Four Music Corp and Gavadima Music Inc. on the one hand ("Owners") and EMI Music Publishing Ltd ("Publisher") as amended May 12, 2009.  Pursuant to Paragraph 1 of the Amendment of May 12, 2009, Owner hereby notifies Publisher of its intention to terminate the Agreement and the administration rights of Publisher effective December 31, 2016.

Very truly yours,

ROBERT GAUDIO for
SEASONS FOUR MUSIC CORP.

By: _____

ROBERT GAUDIO for
GAVADIMA MUSIC, INC.

By: _____

cc:  Frankie Valli
     Barry Siegel
     Zach Best
     Bruce Scavuzzo, EMI Music, Inc.

**FedEx.**       Shipment Receipt

## Address Information

**Ship to:**
c/o Sony/ATV Music
Publishing
EMI Music Publishing Ltd

30 Golden Square

London,
W1F 9LD
GB
020.3206.2501

**Ship from:**
John Mason

Law Offices of John Mason
LLC
40 Music Square West

Nashville, TN
37203
US
6152595325

## Shipment Information:
Tracking no.: 777243244908
Ship date: 09/15/2016
Estimated shipping charges: 52.16

## Package Information
Pricing option:
Service type: International Priority
Package type: FedEx Envelope
Number of packages: 1
Total weight: 0.20   LBS
Declared Value: 0.00   USD
Special Services: Adult signature required
Pickup/Drop-off: Use an already scheduled pickup at my location

## Billing Information:
Bill transportation to: My Account - LOJM-426
Bill duties/taxes/fees to: My Account - LOJM-426
Your reference: 4Seasons - Seasons Four Music
P.O. no.:
Invoice no.:
Department no.:

Thank you for shipping online with FedEx ShipManager at fedex.com.

## Please Note

FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1000, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits; Consult the applicable FedEx Service Guide for details.
The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated.

 **Shipment Receipt**

## Address Information

| Ship to: | Ship from: |
|---|---|
| Director of Business Affairs | John Mason |
| EMI Music Publishing Ltd | Law Offices of John Mason LLC |
| 27 Wrights Lane | 40 Music Square West |
| LONDON, | Nashville,  TN |
| W8 5SW | 37203 |
| GB | US |
| 0203 059 3059 | 6152595325 |

## Shipment Information:
Tracking no.: 777243205613
Ship date: 09/15/2016
Estimated shipping charges:  52.16

## Package Information
Pricing option:
Service type: International Priority
Package type: FedEx Envelope
Number of packages: 1
Total weight: 0.30   LBS
Declared Value: 0.00   USD
Special Services: Adult signature required
Pickup/Drop-off: Use an already scheduled pickup at my location

## Billing Information:
Bill transportation to: My Account - LOJM-426
Bill duties/taxes/fees to: My Account - LOJM-426
Your reference:  4Seasons - Seasons Four Music
P.O. no.:
Invoice no.:
Department no.:

**Thank you for shipping online with FedEx ShipManager at fedex.com.**

## Please Note
FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1000, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits; Consult the applicable FedEx Service Guide for details.
The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated.

# EXHIBIT 5



Ross Charap
Partner

Akerman LLP
666 Fifth Avenue
20th Floor
New York, NY 10103
Dir: 212.259.6407
Dir Fax: 212.905.6495
ross.charap@akerman.com

September 14, 2017

<u>VIA FEDEX INTERNATIONAL MAIL SERVICE</u>

EMI Music Publishing Ltd.
Attn: Dir. of Business Affairs          FedEx International Mail Tracking # 7877 2514 7932
127 Charing Cross Road
London WC2H OQY England

EMI Music Publishing Ltd.               FedEx International Mail Tracking # 7877 2520 0937
Attn: Dir. of Business Affairs
27 Wrights Lane
London W8 5SW England

Sony/ATV Music Publishing Ltd.
Attn: Tim Major                         FedEx International Mail Tracking # 7877 2523 6754
30 Golden Square
London W1F 9LD England

   Re:   *<u>Seasons Four Music Corp. and Gavadima Music Inc. –w– EMI Music Publishing Ltd.</u>*

Ladies and Gentlemen:

Reference is made to the publishing agreement for the world excluding the U.S. and Canada made January 1, 2000, by and among Seasons Four Music Corp. and Gavadima Music, Inc. (collectively, the "<u>Owners</u>"), on the one hand, and EMI Music Publishing Ltd. ("<u>Publisher</u>"), on the other hand (the "<u>Agreement</u>"), as amended on May 12, 2009 (the "<u>Amendment</u>").

Without prejudice to the Owners' position that the Agreement (as amended by the Amendment) was terminated properly by the Owners, effective December 31, 2016, the Owners hereby notify Publisher, pursuant to Paragraph 1 of the Amendment, that the Agreement, and the rights of administration granted to Publisher thereunder as well as Publisher's appointment thereunder as the Owners' attorney-in-fact, shall be deemed terminated effective September 30, 2017.

Pursuant to Paragraph 11 of the original Agreement, please advise by email correspondence addressed to me, as soon as reasonably practicable, of the unrecouped debit balances of the Owners' royalty accounts as of the date of this letter as well as an estimate of what such unrecouped debit balances are anticipated to be on September 30, 2017.

akerman.com

Seasons Four Music Corp. et al. —w— EMI Music Publishing Ltd.
September 14, 2017
Page 2

The Owners hereby reserve all rights and remedies at law and in equity in regard to the matters arising from the disputed termination of the Agreement.

Very truly yours,

Ross Charap, Esq., on behalf of Seasons
Four Music Corp. and Gavadima Music, Inc.


cc: John Mason, Esq.,
    Donald S. Zakarin, Esq.,
    Bruce Scavuzzo (Sony/ATV Music Publishing)